**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN OF ILLINOIS**

| | | |
|---|---|---|
| **QUINTEN E. SPIVEY, individually and on behalf of others similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| vs. | ) ) | Case No. 07-cv-0779-MJR |
| **ADAPTIVE MARKETING, LLC,** | ) ) ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

**REAGAN, District Judge:**

    **I.**    **Introduction & Procedural Background**

According to the Oxford English Dictionary, the phrase "caveat emptor," let the buyer beware, has been part of the English language since 1523, when it was used in connection with the sale of a horse, which might have been ridden upon and be tame or might be "wylde." If "wylde," it was not the merchant who had to beware, but "caveat emptor be ware thou byer." *The Oxford English Dictionary* (online ed.) *available at* http://dictionary.oed.com. This wisdom, a part of our lexicon for nearly 500 years, would have stood Quinten Spivey in good stead when he placed a call to a telemarketer to purchase an Atkins diet product. From that small beginning springs the putative class action lawsuit now under consideration by the Court.

In September 2007, Spivey filed suit against Vertrue, Inc., alleging, *inter alia,* that Vertrue "crammed" consumers' credit cards, debit cards and bank accounts with membership charges without consumers' knowledge or authorization. The lawsuit was filed in the Circuit Court of Monroe County, Illinois, and timely removed to this United States District Court by Vertrue in

1

November 2007. The action now proceeds under Spivey's First Amended Complaint ("FAC") with similar allegations of "cramming" against Adaptive Marketing, LLC (Doc. 50). The two-count complaint against Adaptive alleges breach of contract and unjust enrichment.

## II.   Jurisdiction and Venue

This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this is a class action in which (a) the matter in controversy exceeds the sum or value of $5,000,000 when the claims of individual class members are aggregated, exclusive of interests and costs; and (b) any member of the class is a citizen of a State different from that of any defendant.

Adaptive Marketing, LLC, has the citizenship of its sole member, Idaptive Marketing, LLC, which in turn has the citizenship of its sole member, Vertrue, Inc. Vertrue, Inc., is a Delaware corporation with Connecticut as its principal place of business. Vertrue, Inc., therefore, is a citizen of the states of Delaware and Connecticut for purposes of diversity jurisdiction. *See* 28 U.S.C. § 1332(c)(1). As a result, Adaptive is a citizen of Delaware and Connecticut for purposes of diversity jurisdiction. The putative class Spivey seeks to represent contains citizens of Illinois and Spivey himself is a citizen of Illinois. Accordingly, as required by 28 U.S.C. § 1332(d)(2)(A) at least one member of the class is a citizen of a state different from any defendant. Additionally, the number of putative class members satisfies CAFA's requirement of 100 or more class members.

Venue is proper in the Southern District of Illinois pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

### III. Legal Standards

Summary judgment is appropriate where the pleadings, discovery and disclosure materials on file and any affidavits show that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. ***Estate of Suskovich v. Anthem Health Plans of Virginia,* Inc., 553 F.3d 559, 563 (7th Cir. 2009),** *citing* **Fed. R. Civ. P. 56(c).  Accord *Breneisen v. Motorola, Inc.*, 512 F.3d 972 (7th Cir. 2008);** *Levy v. Minnesota Life Ins. Co.*, **517 F.3d 519 (7th Cir. 2008).**

In ruling on a summary judgment motion, the Court construes all facts and reasonable inferences in the light most favorable to the non-moving party (here, Spivey). ***Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 600 (7th Cir. 2009);** *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, **491 F.3d 625, 630 (7th Cir. 2007);** *Reynolds v. Jamison*, **488 F.3d 756, 764 (7th Cir. 2007).**

The non-movant cannot rest on his pleadings, though.  Rather, the non-movant must provide evidence on which the jury or court could find in *his* favor.  ***Maclin v. SBC Ameritech*, 520 F.3d 781, 786 (7th Cir. 2008).**  As the Seventh Circuit Court of Appeals explained earlier this year:

> [T]he non-moving party must submit evidence that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 694 (7th Cir. 2006).  The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party.

***Giant Screen Sports v. Canadian Imperial Bank of Commerce*, 553 F.3d 527, 531-32 (7th Cir. 2009).**

The Court applies the substantive law of Illinois, the state in which this diversity case was filed, to Spivey's claims.  ***Id.*,** *citing* ***Global Relief Found., Inc. v. New York Times Co.*, 390**

**F.3d 973, 981 (7th Cir. 2004).**

  **IV.** **Analysis**

  In January 2003, Spivey called a telemarketing number because he wanted to buy an Atkins diet product. Adaptive has produced what it claims is a partial recording of that conversation:

> Telemarketer: Thank you for your order. We're sending you a risk free 30-day membership to HomeWorks, offering hundreds of dollars in savings at stores like the Home Depot, K-Mart, Linens & Things and many more. After 30 days, the service is extended to a full year for just $8.00 per month, just $96.00 annually. Billed in advance as Homeworks with the credit card you are using today. You will be charged an annual fee at the end of your 30-day trial period and at the beginning of each new membership year. If you want to cancel, simply call the toll-free number that appears in your kit in the first 30 days and you will not be billed. If you don't save hundreds of dollars in your first year, just call and you'll get a full refund. So look for your kit in your mail is that okay?
>
> Male (allegedly, Spivey): Okay.

According to the FAC, Spivey does not recall participating in this conversation and cannot confirm that the voice on the recording is his. Spivey also claims that he received no "welcome kit" from Adaptive, or, if he did receive a kit, it was designed to look like junk mail so that he discarded it without opening it. Spivey maintained throughout discovery that he had no recollection of the conversation or of receiving the kit. Doc. 158-2, Spivey Deposition 50:21-51-1; 77:20-24. After listening to the tape recording, Spivey admitted that the voice on the recording resembled his voice with a cold. Spivey Dep. 51:6-21.

  **A.** **Breach of oral contract**

  Adaptive contends that Spivey's claim for breach of an alleged oral contract fails as a matter of law for four reasons: (1) the contract between the parties was written, not oral; (2) Spivey cannot establish that he assented to an oral contract; (3) the alleged oral contract on which Spivey

relies contained no "static price" guarantee for Adaptive to have breached; and (4) the Statute of Frauds bars his claim because it relates to performance more than one year after the alleged contract.[1]

Spivey contends that an oral contract was created during the alleged telemarketing call. According to Spivey, only the alleged written contract permitted Adaptive to increase annual charges to him, but he did not receive a copy of the written contract, and, even if he had, the contract would have failed for lack of consideration and mutual assent.

Adaptive replies that consumers are bound by written terms provided after a transaction. According to Adaptive, first, Spivey was told that he would receive written materials in the mail. Second, these written materials were sent to all customers as a matter of course. Third, Spivey was warned in the materials that he should read the agreement and call Adaptive's customer service representative if he had any questions.

The Membership Agreement for September 2002 through September 2003, which Adaptive alleges it mailed to Spivey, provides, in relevant part:

> **TERMS OF MEMBERSHIP AND MEMBERSHIP AGREEMENT** ... UPON ENROLLMENT, YOU AGREE TO THESE TERMS AND CONDITIONS. WE URGE YOU TO READ THIS MEMBERSHIP AGREEMENT CAREFULLY AND IF YOU HAVE ANY QUESTIONS, CALL OUR CUSTOMER SERVICE REPRESENTATIVES AT THE NUMBERS LISTED ON YOUR MEMBERSHIP CARD."

---

[1] It appears from Adaptive's reply that it has wisely abandoned its statute of frauds defense. Spivey is correct that under Rule 8(c) of the Federal Rules of Civil Procedure, "[i]n pleading to a preceding pleading, a party shall set forth affirmatively ... [the] statute of frauds ... and any other matter constituting an avoidance or affirmative defense." Adaptive failed to plead the affirmative defense of the statute of frauds in its Answer (Doc. 107). Consequently, under Rule 8(c), Adaptive has waived the defense and cannot raise it in its motion for summary judgment.

\* \* \* \* \* \*

**2. Membership Term.**  Your Membership is effective for a period of twelve months following the membership enrollment date under the annual membership plan or for the period agreed upon under the installment membership plan authorized by You....

**3. Renewal of Membership.**  Unless You notify Us that You wish to terminate this Agreement and cancel Your Membership by following the instructions below, your Membership will be renewed automatically and You will be charged the then-effective Membership Fee which will appear on your statement.

**4. Payment of Enrollment Fee.**  The payment of your trial period and Enrollment Fee ... is made automatically by a direct charge(s) to the billing source authorized by You in accordance with the payment terms to which You agreed.  We reserve the right to increase or decrease the Enrollment Fee for each renewal Membership Term effective upon renewal of your Membership.  Under the monthly billing plan, We may, at our discretion, increase the monthly Enrollment Fee once in any twelve-month period not more than $2.00 per month....

\*\*\*\*\*\*

**7. Entire Agreement.**  This Agreement contains all of the Terms of Membership and no representations, inducements, promises or agreements concerning the Membership not included in this Agreement shall be effective or enforceable....

\*\*\*\*\*\*

**9. TERMINATION OF MEMBERSHIP**.   YOU MAY TERMINATE THIS AGREEMENT AND YOUR MEMBERSHIP AT ANY TIME BY CALLING US AT THE TOLL FREE NUMBER ON YOUR MEMBERSHIP CARD OR BY NOTIFYING US IN WRITING AT MEMBERSHIP SERVICES, P. O. BOX 24311, OMAHA, NEBRASKA.   YOUR CANCELLATION WILL BE EFFECTIVE PROMPTLY UPON THE RECEIPT OF YOUR CANCELLATION NOTICE....
Doc. No. 122-2, VTRU 01697-01698.

The first hurdle that Spivey must clear to claim breach of contract is whether any contract was formed that could arguably have been breached by Adaptive.  Spivey cannot claim that he did not participate in the telemarketing call and yet claim that an oral contract was formed thereby. "Under Illinois law, a plaintiff seeking relief for breach of an oral contract bears the burden to both plead and prove the essential terms of the agreement sued on; that is, the offer made and its acceptance." *Hytel Group, Inc. v. W.L. Gore & Associates, Inc.*, **2004 WL 524440, \*4 (N.D.Ill.**

**2004),** *citing Richco Plastic Co. v. IMS Co.***, 288 Ill.App.3d 782, 786 (App.Div. 1997)**. "As with any contract, the offer 'must be so definite as to its material terms or require such definite terms in the acceptance that the promises and performances to be rendered are reasonably certain.'" ***Id.,*** *citing Rose v. Mavrakis***, 799 N.E.2d 469 (App.Div. 2003)**. The burden is on Spivey to plead and prove the essential terms of the offer made and its acceptance. Spivey mistakes this burden and makes a lengthy - and confusing - argument that Adaptive is bound by the terms of the telemarketing call whether or not Spivey himself remembers the call and assented to the contract at issue.

Despite Spivey's reservations as to whether he placed the call and participated in the conversation with the telemarketer, he submits that he "has sued Adaptive for breach of the *very* agreement memorialized by the recording and related script." Doc. 167, Plaintiff's Brief, p. 8 (emphasis in original). He contends that "there is no uncertainty as to the terms of the oral agreement in this case" and that the Court need only apply standard contract interpretation "to construe this unambiguous language and determine whether Adaptive complied with it." *Id*., p. 9. In order for Spivey's breach of contract claim to go forward, the Court must assume that the conversation, as memorialized above, occurred and that Spivey accepted a trial membership in HomeWorks. If Spivey maintains otherwise, then there was no contract to breach, and his claim must be dismissed.

Accordingly, assuming that the conversation occurred, Spivey agreed to accept a risk-free 30-day membership in HomeWorks, which, after the 30-day trial period would be extended to a full year for $8.00 per month, or $96.00 annually. Spivey would be charged an annual fee at the end of the trial period and at the beginning of each membership year. Spivey would not be charged if he canceled within the trial period and would receive a full refund if he canceled within the first

year. A kit would be mailed to Spivey. The next step of the analysis, then, is whether the conversation constitutes all of the terms of the contract or whether Spivey was bound by the written terms allegedly provided "in the kit" after the transaction.

At Spivey's deposition, he was closely questioned as to whether he received the HomeWorks membership package, or "welcome kit," referenced in the conversation with the telemarketer:

> Q. Okay. It's your testimony and you're swearing under oath -- you are taking the oath seriously, I believe that. I just want to make sure I know exactly what you're saying. You're telling me you did not receive it. You're not telling me I don't remember receiving it. Those are two different things, in my mind.
>
> A. I don't know if I can answer the question any better than that. I have no recollection, no record of receiving it.
>
> \*\*\*\*\*\*
>
> Q. You don't believe you received it, and we talked about the reasons why. My question is, is it your -- are you saying the possibility does not exist that it came to your house?
>
> A. I do not think it did. I mean, I would swear that I didn't see it. Doc. 167-8, Spivey Dep. 30:21-31:5.
>
> \*\*\*\*\*\*
>
> Q. Okay. And it's your position that you don't remember seeing it arriving at your house?
>
> A. I have no recollection of that.
>
> Q. Okay. And my only point was, it is possible that it showed up at your house, and you didn't see it; isn't that true?
>
> A. I think a very, very small chance that it would have 'cause I do review -- I go through all of the mail, as I said, many times. Doc. 171-2, Spivey Dep. 36:2-10.

Set against Spivey's testimony is Adaptive's evidence showing its standard business practices. In the affidavit of Judy Muller, Director of Affinity Marketing at Adaptive, Muller stated

that, in instances where a third-party like West marketed Adaptive's programs, West is responsible for soliciting consumers and Adaptive is responsible for fulfillment, such as sending membership materials and providing customer service to consumers who enroll through third-party marketing. Muller Affidavit, Doc. 75, Exhibit 2, ¶ 4. Muller explained that fulfillment for the telemarketing offer consisted of sending "a self-mailer, 11 by 17 postcard essentially." Doc. 171-2, Muller Deposition 36:2-5. The postcard contained "benefit providers, a membership card with a membership ID number, terms and conditions, and an 800 number to access the program, as well as a website URL to access the program." *Id*. 36:12-18. Muller further explained that the postcard was not in an envelope and that the membership card could be punched out of the postcard. *Id*. 36:19-22; 37:1-2. According to Muller, once the sale is loaded, fulfillment materials are mailed out which usually reach the customer in 7 to 10 business days. *Id*. 111:12-17. When asked how she knew that the renewal notice was sent to Spivey, Muller testified, "It's our corporate policy to always send renewal notices for annual billings." Muller Dep. 32:1-4.

The Seventh Circuit had an opportunity to consider a very similar issue in ***Boomer v. AT & T Corp*., 309 F.3d 404 (7th Cir. 2002)**.[2] The plaintiff in *Boomer* did not admit that he

---

[2] In Spivey's motion to strike new arguments from Adaptive's reply brief (Doc. 175), he argued that the Court should strike any reference to testimony from Spivey's second deposition, and any new argument based on the *Boomer* case. The Court granted Spivey's motion to the extent that the Court would disregard any new arguments made in Adaptive's reply (Doc. 176). At first blush, the Court was inclined to disregard testimony offered by Adaptive from Spivey's second deposition, which was taken after the dispositive motion deadline. Having now delved more deeply into the parties' submissions, the Court realizes that Spivey himself offers as evidence the very deposition that he seeks to bar Adaptive from relying on. Doc. 167-8. At the same time, Spivey notes that the purpose of the reply brief is "to give the movant an opportunity to respond to matters raised in the other party's opposition brief...." It offends the Court's sense of equity and fairness to allow Spivey to cite to the deposition and to strike that testimony from Adaptive's reply brief. Under the widely accepted principle of "what's sauce for the goose is sauce for the gander," that will not be allowed. As to "mischaracterization" of testimony, the

received the consumer service agreement mailed to him by the defendant. **309 F.3d at 415**. He did not contend that he had not received it, only that he did not remember receiving it. *Id.* The Court explained, "Where a letter is properly addressed and mailed, there is 'a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed.'" *Id., citing Hagner v. United States*, **285 U.S. 427, 430 (1932)**. Through the declaration of an employee, the defendant presented proof that proper mailing procedures were followed, and the plaintiff provided no conflicting evidence. *Id*. The Court then reasoned that it "must presume that [the plaintiff] received the mailing." *Id*., *citing Godfrey v. United States*, **997 F.2d 335, 338 (7th Cir. 1993) (a presumption exists that a mailing is received where there is "proof of procedures followed in the regular course of operations which give rise to a strong inference that the [correspondence] was properly addressed and mailed"**).

     Like the plaintiff in *Boomer*, Spivey does not admit that he received the membership agreement. When pressed, he did not deny receiving the agreement but, rather, stated that he did not recall receiving it. Of particular note is Spivey's response when counsel attempted to pin down the answer to whether Spivey was saying he did not receive the mailing or he did not remember receiving it. Spivey responded that he had no better answer than "I have no recollection, no record of receiving it." Like the defendant in *Boomer,* Adaptive has provided evidence by way of an employee's deposition and affidavit showing that Adaptive followed a standard mailing practice. Additionally, Adaptive offers evidence showing that Spivey's home address, as provided to the telemarketer, matches the address on his credit card statement. Doc. 171, Exhibit 16. Lastly, Spivey

---

Court is very well able to determine if any party mischaracterizes testimony. Finally, the Court will not disregard argument based on *Boomer* because the "mailbox rule" is well-known to the Court and would have been considered by it in any case.

also does not contend that he did not receive the diet product that he ordered and which was the genesis of the phone call. As a result, the Court must presume that Spivey received the mailing. The next step of the analysis is to determine whether Spivey is bound by the written terms provided after the transaction.

Adaptive relies on *ProCD v. Zeidenberg,* **86 F.3d 1447 (7th Cir. 1996)** and *Hill v. Gateway 2000, Inc*. **105 F.3d 1147 (7th Cir. 1997)** to argue that the parties' agreement was the written membership agreement mailed to Spivey and not the oral agreement made in the telemarketing call. In *ProCD*, Zeidenberg purchased computer software from ProCD which contained a "shrinkwrap license" in its packaging, but he chose to ignore the license. *ProCD,* **86 F.3d at 1450**. Analogizing the provision of the license after the transaction was complete to the purchase of insurance, airline tickets and concert tickets, the appellate court held that Zeidenberg was bound by the terms of the license. *Id***. at 1455**. The Court explained, "A vendor, as master of the offer, may invite acceptance by conduct, and may propose limitations on the kind of conduct that constitutes acceptance. A buyer may accept by performing the acts the vendor proposes to treat as acceptance." *Id***. at 1452**. Zeidenberg used the software after having an opportunity to read the license thus forgoing the opportunity to prevent the formation of the contract by returning the package. *Id***.**

Similarly, in *Hill*, customers, Rich and Enza Hill, ordered a computer by phone, paying by credit card. *Hill***, 105 F.3d at 1148**. Included in the box with the computer was a list of terms - one of which was an arbitration clause - which would govern unless the customer returned the computer within 30 days. *Id*. The question before the Court was whether these terms were "effective as the parties' contract," or whether the contract was "term-free because the order-taker

11

did not read any terms over the phone and elicit the customer's assent." *Id*. The Hills kept the computer more than 30 days before they began complaining about the its shortcomings. *Id*. The Seventh Circuit held that the Hills were bound by the written contract. *Id*. **at 1151**. The Court refused to limit the holding of *ProCD*, as the Hills sought, instead reiterating that payment preceding the revelation of full terms is common in many endeavors. *Id*. **at 1149**. The Court explained,

> Practical considerations support allowing vendors to enclose the full legal terms with their products.... If the staff at the other end of the phone for direct-sales operations such as Gateway's had to read the four-page statement of terms before taking the buyer's credit card number, the droning voice would anesthetize rather than enlighten many potential buyers.... Writing provides benefits for both sides of commercial transactions. Customers as a group are better off when vendors skip costly and ineffectual steps such as telephonic recitation, and use instead a simple approve-or-return device. Competent adults are bound by such documents, read or unread. *Id*. **at 1149**.

Spivey attempts to distinguish *ProCD* and *Hill*, contending that (1) the terms allegedly provided by Adaptive were not included with a physical product; (2) the plaintiffs in those cases did not assert claims for breach of prior oral agreements; and (3) the terms of the oral contract in the current proceedings contradicted the terms in the written agreement.

First, the holding in *ProCD* and *Hill* is not so narrow as Spivey suggests. In its analysis, the Seventh Circuit stated that the receipt of terms after payment is common in many endeavors, including other purchases such as airplane and concert tickets as well as insurance contracts. None of which, this Court notes, is sent with a physical product. The undersigned Judge also observes that insurance contracts are frequently updated or modified by carriers through mail notification. And, as the Seventh Circuit declared, competent adults are bound by these documents. The fact that Spivey did not utilize the program does not alter the Court's analysis. The program was available to him, and the agreement is no more void than the agreement in *Hill* would have been

12

if the Hills had left the computer in the box.

In sum, Adaptive invited acceptance by conduct, *i.e.*, by sending the kit to Spivey and allowing him the opportunity to call within 30 days to cancel the agreement or to call within the first year to receive a full refund.  By not calling the toll-free number in the first 30 days (or even in the first year) - as advised by the telemarketer *and* set forth in the agreement - Spivey accepted the offered services and the terms and conditions under which they were offered.  He had a clear mechanism and reasonable opportunity to reject them.  Spivey is bound by the written terms provided after the transaction.

Fairly seen, Spivey's remaining arguments regarding an oral contract are rendered meritless by the Court's previous analysis.  However, two additional points bear on and support the Court's conclusions.  First, the Court observes that the written agreement contains an integration clause providing that it contains all terms of membership and that no other representations or agreements concerning membership not included in the agreement are enforceable.  *See* Doc. 122-2, ¶ 7, *supra*.  Under Illinois law, there is a presumption that written contracts include all material terms agreed upon by the parties.  ***Taimoorazy v. Bloomington Anesthesiology Service, Ltd.,* 122 F.Supp.2d 967, 973 (C.D.Ill. 2000),** *citing Commonwealth Eastern Mortgage Co. v. Williams*, **516 N.E.2d 515, 520 (1st Dist.1987)**. Numerous Illinois and Seventh Circuit cases teach that where parties include an integration clause in a contract, they are manifesting an intent to protect themselves from misrepresentations that could arise from extrinsic evidence.  ***First American Commercial Bancorp, Inc. v. Interior Architects, Inc*., 2004 WL 2011398, 11 (N.D.Ill. 2004),** *citing Air Safety, Inc*.**, 706 N.E.2d at 885-86 (refusing to consider alleged oral and written evidence because of presence of integration clause);** *Brooklyn Bagel Boys, Inc*. *v. Earthgrains*

*Refrigerated Dough Products, Inc.*, **212 F.3d 373, 380-81 & n. 7 (rejecting use of extrinsic evidence where contract had integration clause and terms were clear);** *Talano v. Northwestern Med. Faculty Found., Inc.*, **2000 WL 1100337, at \*6 (N.D.Ill. 2000) (rejecting consideration of "side letter" when contract had integration clause)**. Even if the terms of the written agreement contradicted the terms of the oral agreement, where, as here, the written agreement explicitly states that it contains all of the terms of the agreement, the written agreement constitutes the only enforceable agreement between the parties. *Zahran v. Nat. Guardian Life Ins. Co.,* **1993 WL 116738, at \*2 (N.D.Ill. 1993)**. This brings the Court to its second point, which is that the terms of the oral agreement do not contradict those of the written agreement.

The telemarketer stated that Spivey's service would, after 30 days, be "extended to a full year for just $8.00 per month, just $96.00 annually." Spivey would be charged an annual fee at the end of the 30-day trial period and at the beginning of each new membership year. Spivey asks the Court to read into those words a guarantee that the price of membership would never increase beyond $96.00. As stated above, under Illinois law, formation of an oral contract requires that all material terms be definite so that the promises and performances to be rendered are reasonably certain. There is simply no such guarantee - no definite, material term setting a static price - in the script. The terms do not contradict the written agreement which states that payment for the trial period would be in accordance with the payment terms to which Spivey agreed. The agreement provides additional - but not contradictory - language asserting Adaptive's right to increase or decrease the fee for each renewal term at the then-effective price unless Spivey called and canceled his membership. As the Seventh Circuit stated in *Hill*, a lengthy telephone recitation of terms is of little value to consumers who are better off with written terms and an approve-or-return device.

*Hill*, **105 F.3d at 1149**.

If there is a case to be made for "cramming" against Adaptive, Spivey is not the plaintiff who can make that case. According to the FAC, "'cramming' is the practice of imposing unauthorized charges on consumer credit card and other billing statements." FAC, ¶ 1. Or, as defined by the Seventh Circuit, cramming is "the shady practice of putting bogus charges on a person's bill (usually a monthly credit card statement) in the hope that the consumer will pay the inflated balance without noticing that he has been duped." ***Lakin Law Firm, P.C. v. F.T.C.*, 352 F.3d 1122, 1123 (7th Cir. 2003)**. The charges to Spivey's credit card were not "unauthorized" or "bogus" because he orally agreed to accept the program, received the membership agreement with all terms plainly spelled out and did not cancel his membership according to those terms. Instead, he paid those annual charges repeatedly without inquiry. When Spivey ultimately called the toll-free number provided, his membership was canceled immediately, and he received a *pro rata* refund under the terms of the contract. This is not typical "cramming," where a consumer is charged hidden fees, may find it impossible to stop the charges short of canceling a credit card or closing a bank account and may find it impossible to obtain any refund. ***See, e.g., In re National Credit Management Group, LLC,* 21 F.Supp.2d 424 (D.N.J. 1998) (consumers claimed they were charged hidden fees, could not cancel, found it impossible to meet refund conditions);** *Wike v. Vertrue, Inc*.**, 2008 WL 2704364, at \*5 (M.D.Tenn. 2008),** *rev'd,* **566 F.3d 590 (6th Cir. June 2, 2009) (consumer claimed membership charges continued for several months after requesting that membership be canceled)**.

Despite Spivey's self-serving testimony, he authorized the telemarketer to make charges to his credit card and was mailed a written agreement with detailed terms. He cannot sue

for breach of contract under any theory except that he authorized those charges. Nor can he create genuine issues of material fact by contradicting his own prior statements and his own claim.

In light of the foregoing, the Court finds that there is no genuine issue of material fact, and Adaptive is entitled to judgment as a matter of law. No reasonable jury could find otherwise.

### B. Voluntary Payment Doctrine

The voluntary payment doctrine provides an independent, second ground for dismissing Spivey's claims. "Under this doctrine, a plaintiff who voluntarily pays money in reply to an incorrect or illegal claim of right cannot recover that payment unless he can show fraud, coercion, or mistake of fact." *Randazzo v. Harris Bank Palatine, N.A.,* **262 F.3d 663, 666 (7th Cir. 2001)**, *citing Smith v. Prime Cable of Chicago,* **658 N.E.2d 1325, 1329-30 (1995);** *Jursich v. Arlington Heights Fed. Sav. & Loan Ass'n*, **441 N.E.2d 864, 866 (1982)**.

Quoting *Smith,* the *Randazzo* decision explains that the reason for the voluntary payment doctrine is:

> quite obvious when applied to a case of payment on a mere demand of money unaccompanied with any power or authority to enforce such demand, except by a suit at law. In such case, if the party would resist an unjust demand, he must do so at the threshold. The parties treat ... each other on equal terms, and if litigation is intended by the one of whom the money is demanded, it should *precede* payment. When the person making the payment can only be reached by a proceeding at law, he is bound to make his defense in the first instance, and *he cannot postpone the litigation by paying the demand in silence or under a reservation of right to litigate the claim, and afterward sue to recover the amount paid*.

*Randazzo,* **262 F.3d at 668,** *quoting Smith,* **658 N.E.2d at 1330 (additional citation omitted) (emphasis added)**.

Spivey, who is the person in his household who reviews credit card statements and is aware of customary charges, made credit card payments for his membership in HomeWorks in

16

2003, 2004, 2005 and 2006. Doc. 158-2, Spivey Dep. 72:3-14. Spivey has provided copies of his credit card statements. Doc. 167-10. As an example, the January 17, 2006, statement itemizes a $199.95 charge by HomeWorks Plus and provides an 888 number for inquiries. Doc. 167-10 Spivey000006. The charge is in no way obscured and, in fact, stands out against the other four charges, all of which are local. *Id*. But Spivey did not promptly call his credit card company or the 888 number to question the HomeWorks charge. *Id*. 99:1-10. Nor did Spivey call his credit card company or Homeworks for previous charges as they appeared on his statement. *Id*. 99:11-20.

Spivey submits that the voluntary payment doctrine does not apply because Adaptive lacks standing and because payment was made on a mistake of fact. As to this latter contention, the Court previously allowed the "mistake of fact" defense to survive on Adaptive's motion to dismiss. Now, on a fuller record and on motion summary judgment, the Court concludes that Spivey was under no mistake of fact when he paid the charges. He has no explanation for why he paid the annual membership fee for four years before he acted. Even if he believed that his wife had authorized the charge, he failed to speak to her or to look into the charges until February 13, 2007, *after* he paid the final January 2007 charge. *Id*. 14:12-15:1; Doc. 75-5, Vert00029. In sum, he made no effort to discover the nature of the charge to his credit card and paid it "in silence." As a result, does not come within the "mistake of fact" exception to the voluntary payment doctrine. ***Harris v. ChartOne,* 841 N.E.2d 1028, 1032 (Ill.App. Ct. 5 Dist. 2005)**, ***citing Goldstein Oil Co. v. County of Cook*, 509 N.E.2d 538 (1987)**. **(no exception to the voluntary payment doctrine when the plaintiff makes no effort to ascertain the factual basis of an invoice but pays it anyway)**. To the extent that Spivey was ignorant of the charges on his credit card statement, it was because he failed or refused to apprise himself of that knowledge, and he must bear the consequences.

Spivey argues that Adaptive's citation to ***Riensche v. Cingular Wireless, LLC*, 2007 WL 3407137 (W.D. Wash. 2007)** is misleading because the case was reversed by the Court of Appeals and because Adaptive does not indicate that the defendant sent monthly itemized statements to the plaintiff. The Court notes that the Ninth Circuit Court of Appeals reversed ***Riensche*** on grounds other than the lower court's finding that the plaintiff's payment was voluntary for failure to review his statements. Rather, the Ninth Circuit reversed because it found that the Washington Business and Occupations tax statute was not preempted by the Federal Communications Act. ***Riensche v. Cingular Wireless, LLC*, 2009 WL 784265, \*1 (9th Cir. 2009)**. The appellate court did not disturb the district court's conclusion that the weight of authority places on the payor an obligation to investigate and to dispute charges. ***Riensche*, 2007 WL 3407137, at \*6 (collecting cases)**.

Spivey's argument that Adaptive lacks standing to assert a defense under the voluntary payment doctrine, while ingenious, flies in the face of modern economic reality and lacks any supporting authority. Spivey describes Adaptive's defense based on this doctrine as "the 'failure to dispute a credit card bill issued by a third-party credit card company three steps removed from this well disguised defendant long after it has already been paid by the credit card company via a third-party payment processor' defense." The imposition of automatic charges to credit cards to pay monthly, semiannual or annual bills is a common business practice that does not require a consumer's physical presence and a signed credit card receipt such as that required at a point-of-sale transaction at a store.

The voluntary payment doctrine is applicable to this action, and Spivey cannot recoup his payments from Adaptive.

### C. <u>Unjust Enrichment</u>

The parties spend little time arguing the unjust enrichment count, perhaps realizing - correctly - that it stands or falls in concert with the Court's ruling on the breach of contract issues set forth above. First, Illinois law provides that the doctrine of unjust enrichment is inapplicable where, as here, a contract controls a relationship between parties. ***Cohn v. Anthem Life and Health Ins. Co.,* 965 F.Supp. 1119, 1121 (N.D.Ill. 1997),** *citing* ***People ex rel. Hartigan v. E & E Hauling,* 607 N.E.2d 165, 177 (1992);** ***La Throp v. Bell Fed. Sav. & Loan Ass'n,* 370 N.E.2d 188, 195 (1977)**. Second, the voluntary payment doctrine discussed above precludes payment in any event. ***Ergo v. International Merchant Services, Inc.*, 519 F.Supp.2d 765, 774 (N.D.Ill. 2007)**.

### D. <u>The Interests of Putative Class Members</u>

Rule 23(e) provides:

> Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

**FED.R.CIV.P. 23(e)**. Notice of dismissal may not be required when class allegations are dismissed prior to certification. ***Simer v. Rios*, 661 F.2d 655, 666 (7th Cir. 1981) (stating that Rule 23(e) does not invariably require notice when a case settles before certification)**. Here, class members have received no formal notice of the class action and, as a result, would not have relied on it to protect their interests. Furthermore, since this action is being dismissed prior to certification, the "dismissal would not have a res judicata effect as to the absent putative class members." ***Hickerson v. Velsicol Chem. Corp.*, 121 F.R.D. 67, 68 (N.D.Ill. 1988) (holding that Rule 23(e) notice was required for an agreed dismissal after a class had been certified but distinguishing that situation from a pre-certification dismissal)**. Lastly, as the Seventh Circuit explained in ***Glidden***

*v. Chromalloy American Corp.*, **808 F.2d 621 (7th Cir. 1986)**,

> When notice would be a fruitless yet costly gesture, Rule 23(e) - read in light of Rule 1 - does not compel the parties to incur pointless expense. Excusing notice in a settled case should be rare, because as *Simer* observes the due process clause also is in play. Notice may be dispensed with more freely when the class claims are being dismissed. But *Simer* does not discuss the application of Rule 23(e) to dismissals or the extent to which the district court's approval is required. We conclude that what may not be dispensed with is the district court's approval of the elimination of an uncertified class claim. *Glidden*, **808 F.2d at 627-28**.

Because the Court will dismiss this action prior to certification with no class members relying on the action and no res judicata effect, and because requiring notice would be a fruitless, costly gesture, the Court concludes that Rule 23(e)'s notice requirements are not mandated in this case.

### V.     Conclusion

For the foregoing reasons, the Court **GRANTS** Adaptive Marketing, LLC's, motion for summary judgment (Doc. 157) and **DISMISSES** this action **with prejudice**. The Clerk of Court is directed to enter judgment in favor of Defendant Adaptive Marketing, LLC, and against Plaintiff Quinten E. Spivey. This case is closed.

**IT IS SO ORDERED.**

**DATED this 23rd day of September, 2009**

**s/Michael J. Reagan**
**MICHAEL J. REAGAN**
**United States District Judge**